1
2
3
4

DANIEL HOROWITZ (SBN: 92400)
LAW OFFICE OF DANIEL HOROWITZ
3650 Mt. Diablo Blvd., Ste. 225
Lafayette, CA 94549
Telephone: (925) 283-1863
horowitz@physiciandefense.lawyer

5
6
7
8
9

CHARLES BOND (SBN: 60611)
PHYSICIANS' ADVOCATES
2033 N. Main St., Ste. 340
Walnut Creek, Ca 94596
Telephone: (510) 841-7500
cb@physiciansadvocates.com

10
11

Attorneys for Plaintiff
STEPHEN NOBLE, M.D.

12

**IN THE UNITED STATES DISTRICT COURT**

13

**EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION**

14
15
16
17
18
19
20
21
22
23
24

| | |
|---|---|
| STEPHEN NOBLE, M.D.,<br><br>                Plaintiff,<br><br>    vs.<br><br>SUTTER HEALTH, GOULD MEDICAL GROUP, INC., SUTTER GOULD MEDICAL FOUNDATION, SUTTER VALLEY MEDICAL FOUNDATION, INC SUTTER MEMORIAL MEDICAL CENTER, LIT K. FUNG, M.D., JUDY FUNG, JOHN TALIEH, M.D., AND DOES 1-100<br><br>                Defendants | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br><br>**JURY TRIAL DEMANDED**<br>**(RULE 201 - FED. R. CIV. P. 38)** |

25
26
27
28

    COMES NOW Plaintiff, STEPHEN NOBLE, M.D. and by and through his attorneys

as to Defendants GOULD MEDICAL GROUP, INC., SUTTER GOULD MEDICAL

FOUNDATION, SUTTER VALLEY MEDICAL FOUNDATION, INC., SUTTER

HEALTH, SUTTER MEMORIAL MEDICAL CENTER, LIT K. FUNG, M.D., JUDY

FUNG, JOHN TALIEH, M.D., AND DOES 1-100, and hereby files this Complaint and

alleges as follows:

I.    **SYNOPSIS**

1.        Sutter Health, Sutter Gould Medical Group along with the other Defendants

are  guilty of using unfair and racially discriminatory practices against Black and other

minority doctors. For their own economic gain and control of power, Defendants use false

allegations and intimidation tactics to target their own doctors – especially Black and other

minority doctors to "keep them in line" and to suppress them financially and

psychologically.

2.        Stephen Noble, M.D., who is Black, was the victim of Defendants' racially

motivated attacks, even though he is one of the country's most highly trained surgeons.  He

now brings this complaint for damages – including punitive damages and injunctive relief –

to expose and halt Defendants' unlawful systemic racism and to restore the respect due him

as well as other Black and minority physicians who have similarly been the victims of

Defendants' racist practices.

3.        In recruiting Dr. Noble to be a Sutter doctor, Defendants flatly lied to him

and made false promises about the job they were offering to him; then, based on his race,

they gave him an employment contract that broke their promises and paid him far below

other physicians in his specialty who were not Black.

4.        In reliance on Defendants' promises, Dr. Noble moved his family across the

country and started to work on September 4, 2018, but Defendants took systematic,

malicious, and calculated steps to assure his failure. Defendants actively prevented him from

building a practice and earning what other doctors in his specialty earned. For example, they refused to put him on the ER call schedule, they canceled or reassigned surgeries on Dr. Noble's patients without Dr. Noble's knowledge, etc.

5.      Ultimately, Defendants fabricated sham allegations about Dr. Noble's patient care, even though Dr. Noble's surgical outcomes were better than the other surgeons employed by Sutter Gould in his specialty.

6.      In the meantime, pretextually, Defendants used their sham allegations and his low productivity (which they caused) as the basis for slashing Dr. Noble's salary by sixty percent (60%), making **Dr. Noble the lowest paid full-time cardiothoracic surgeon in the entire United States.** This obscene pay cut was racially motivated. Obviously, he was earning far less than Sutter Gould's other cardiothoracic surgeons who were not Black.

7.      Dr. Noble could not just resign and move on. As long as Defendants' sham allegations were pending against him, he was considered to be "under investigation". If he went ahead and resigned while "under investigation", Sutter and Sutter Gould would have to report him to the California Medical Board (placing his medical license in jeopardy), and to the National Practitioners' Data Bank (NPDB), which is a federal data base that identifies doctors who have a history of malpractice or medical discipline. **A Data Bank report is ruinous to a doctor's career** because the Data Bank **must** be consulted by all future employers, hospitals, health plans, and other organizations that are key to the doctor's livelihood. A report to the NPDB places a serious stigma and permanent stain on a doctor's professional career and makes it very difficult for the doctor to find new employment or to carry on professionally; thus, it carries huge financial consequences for the doctor.

8.      Using classic bullying tactics, Defendants repeatedly threatened to report Dr.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Noble to the Medical Board and Data Bank. With their constant threats of reporting hanging over Dr. Noble's head, he was forced to work in Defendant's hostile and racist environment against his will. To keep Dr. Noble from taking another job and to further damage his reputation, Defendants deliberately dragged out their baseless "investigation" for nine months.

9.     Defendants have used these bullying tactics against other Black and minority physicians throughout the Sutter system as a means of intimidation as a way to force the physicians to remain employed by Sutter's medical groups, and as a way to drastically cut the doctors' pay. Defendants kept threatening Dr. Noble with a form of disciplinary action known as a Performance Improvement Plan ("PIP"). Defendants refused to clearly state their basis for the PIP. Dr. Noble refused to agree to the PIP. In spite of this refusal, however, Defendants falsely asserted that Dr. Noble was under a PIP. Like an "investigation," doctors cannot resign while they are under a performance improvement plan without being reported. So, Dr. Noble repeatedly asked Defendants to clarify his PIP status, but Defendants refused to answer, leaving him in limbo and unable to get out of the racist and hostile work environment.

10.     Defendants then conspired to initiate a peer review investigation against Dr. Noble based on bogus charges. Again, Dr. Noble could not leave without being reported.

11.     Ultimately, Dr. Noble had to disprove Defendants' sham allegations - **not once, but twice**. The effort, the cost, and the toll on his reputation caused him serious physical and emotional distress. He first disproved the charges to the satisfaction of his Department. However, Defendants apparently were not satisfied, so they referred the 'investigation' to an "outside reviewer." It turned out, however, that the reviewer himself

had been severely disciplined and unceremoniously removed as Chair of his Department at Baylor for his excessively high complication rate of 15%. In support of his case, Dr. Noble offered opinions from one of the country's leading experts in cardiothoracic surgery. Dr. Noble's expert was able to show that Dr. Noble's care was perfectly within acceptable standards. Sheepishly, the Medical Executive Committee (the body that governs the medical staff) voted not to impose discipline on Dr. Noble.

12.    Dr. Noble endured over two and a half years of racially motivated mistreatment and humiliation by Defendants. So, as soon as he was no longer "under investigation" Dr. Noble submitted his resignation from Sutter Gould Medical Group and from the Medical Staff of Sutter Memorial Hospital. Defendants literally drove him out of town by constructively discharging him based on their discriminatory and tortious acts.

13.    Subsequent events bore out Dr. Noble's belief that Defendants actions were race-based. While Dr. Noble was struggling so hard to build a patient base, Sutter and Sutter Gould were plotting to recruit and hire his replacement. Dr. Noble's last day was the new recruit's first day at work. The replacement doctor was ethnically Chinese. It was reported that Dr. Fung, head of Cardiothoracic Surgery, stated to a colleague that he was glad to finally have "someone who looked like him" working with them. Sutter Gould also subsequentially hired another cardiothoracic surgeon who is Caucasian.

## II.    AN INTRODUCTION TO PLAINTIFF, STEPHEN NOBLE, M.D., PHYSICIAN AND DECORATED WAR HERO

14.    Plaintiff, **Stephen Noble, M.D.** is a board-certified cardiothoracic surgeon, with advanced fellowship training in heart surgery. Dr. Noble participated in a Master's program in Medical Sciences in 2001 at the Indiana School of Medicine.  He later graduated from the same University with a medical degree in 2006.  From 2006-2011, Dr. Noble was a

General Surgery Resident at Oregon Health and Science University.

15.        From 2011-2013 he served as a General Surgeon at the Naval Hospital Twentynine Palms. He then obtained further surgical expertise at Ohio State University completing a Cardiothoracic Fellowship (2013-2015). Dr. Noble served as chief resident at Ohio State and received the Housestaff Citizenship Award.  He then became an Assistant Professor, United States Navy, Naval Medical Center Portsmouth in Cardiothoracic Surgery (2015-2018).  Dr. Noble's distinguished curriculum vitae is attached as Exhibit A. All told, Dr. Noble has had twelve years of medical training including two years of highly specialized training in heart and cardiothoracic surgery. He has authored scientific papers and lectured in his field. His training and professional achievements make Defendants' treatment of him all that much more disrespectful and abasing.

16        **Dr. Noble is a decorated war hero** who proudly served our country in the armed forces for seven years as a general surgeon and cardiothoracic surgeon. He was deployed to Afghanistan in 2016 as part of Operation Resolute Support where he treated over 81 severely injured soldiers with a 99% survival rate. Even when his camp came under attack, he kept on triaging and treating the wounded. For his brave service in this very dangerous combat zone, he received two Navy and Marine Corps Commendation Medals, the National Defense Service Medal, the Afghanistan Campaign, the Global War on Terrorism Medal, the NATO ISAF (International Security Assistance Force) Medal, and the Navy Sea Service Deployment Award; he also received commendations for: Navy Expert Rifle Qualification, Navy Expert Pistol Qualification, and Combat Casualty Care Course Sierra Platoon Leader.

III.        **THE DEFENDANTS AND OTHER RELATED ENTITIES**

17.         Sutter Health intentionally obfuscates its relationships among the various Sutter enterprises by frequently changing corporate names and corporate structure. This corporate shell game is intended to confuse consumers, the courts and even its employed physicians. All the entities in the health system, however, still start with the word "Sutter." Sutter Health consists of at least 24 acute care hospital facilities, 31 ambulatory surgery centers, nine cancer centers, six specialty care centers, nine major physician organizations, 8,200 physicians and 48,000 employees located in 19 counties in Northern California. All report to a single CEO. The description of the duties of Sutter Health's CEO on its website clearly show both the united hierarchy, and unity of interest of all the Sutter entities: "As president and CEO of Sutter Health, Sarah Krevans leads the network's 24 hospitals, 53,000 employees, 14,000 clinicians, outpatient services, research facilities, home health and hospice care services, and business professionals."[1]

18.         Thus, the corporate Defendants are all clearly affiliated corporations and agents of each other (See Corp. C. §150), as well as co-conspirators.

19.         **Sutter Health** is a 501(c)(3) corporation which was established to provide assistance to other corporations which included "Sutter Gould Medical Foundation" (See Exhibit I (May 11, 2012 Amended and Restated Articles of Incorporation.)) These articles were amended on December 20, 2018 (Exhibit J) and eliminated Sutter Gould Medical Foundation and substituted Sutter Valley Medical Foundation in its place. Therefore, at all times relevant herein, Sutter Valley Medical Foundation and Sutter Health existed to assist each other's business goals and are operationally and financially interrelated.

20.         **The Sutter Gould Medical Group, Inc**. ("Sutter Gould") is a California

---

[1] https://www.sutterhealth.org/about/leadership

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

professional corporation which employed Dr. Noble. (The Memorandum of Understanding is attached hereto as Exhibit B and the Employment Contract is attached as Exhibit C.) "Gould Medical Group of the Sutter Gould Medical Foundation" is how the entity self identifies itself in the Memorandum of Understanding with Dr. Noble. (Exhibit B dated January 8, 2018). However, a copy of the 2nd Restated Articles of Incorporation that were in effect at all times relevant herein, is attached as Exhibit D.  The Statement of Information filed February 19, 2019 and the Statement of Information filed September 3, 2019 are attached as Exhibits E  and F respectively. No other Statement Information has ever been filed. The entity has been a registered California corporation since 11/12/1971. These documents identify the entity as "The Sutter Gould Medical Foundation." This complaint uses the name registered with the State of California and abbreviates it to "Sutter/Gould".

21.     **The Sutter Gould Medical Foundation** (which Gould in its Memorandum of Understanding claimed to be part of or related to as set forth in paragraph 2 above), did not exist in 2018 or at any time relevant to this action.  Said group was "merged out" on March 1, 2016 and was absorbed into the "Sutter Valley Medical Foundation" (Exhibit G). Hence any references to "Sutter Gould Medical Foundation" are intended to reference "Sutter Valley Medical Foundation" (and vice versa) as a single, integrated entity. The abbreviation "SVMF" will be used in this complaint to represent this merged entity.

22.     **Sutter Valley Medical Foundation, Inc**. (SVMF) is a California Corporation which by its  Amended and Restated Articles of Incorporation (11/1/2015), filed herein as Exhibit H have been formed (in part), to establish clinics and medical facilities and "[t]o contribute to the growth, development and financial strength of Sutter Health...". The corporation is a 501(c)(3) corporation under the Internal Revenue Code of 1986.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

23.        **Sutter Memorial Medical Center** ("MMC") is a not-for-profit hospital, part of the Sutter Health network.  It is located at 1700 Coffee Road Modesto, California.  It is also called SutterHealth Memorial Medical Center. (herein "Sutter Memorial".)

24.        **Doctors Medical Center of Modesto, Inc.** ("DMC") is a hospital located in Modesto which is a subsidiary of Tenet Healthcare Corporation.

25.        **Lit K. Fung, M.D.** is a thoracic surgeon employed by Sutter Gould who both supervised and interacted with Dr. Noble. Dr. Lit K. Fung, M.D., was at all times relevant herein, a senior partner at Sutter Gould. In all matters alleged herein which relate to Dr. Fung, Plaintiff alleges that Dr. Fung acted in the course and scope of his employment with Sutter Gould and that his conduct, including his racially discriminatory and other wrongful conduct, was known to Sutter Gould and ratified by Sutter Gould. Dr. Lit K. Fung, M.D., further acted in concert with, aiding and abetting and in conspiracy with other persons to accomplish the unlawful conduct perpetrated against Dr. Noble.

26.        **Judy Fung** is the wife of Lit K. Fung, M.D. She is not an employee of Sutter Health or Sutter Gould, yet she scheduled the cardiothoracic surgeries for Sutter Gould patients. Hence, whenever when Dr. Noble wanted to schedule a surgery at Sutter Memorial or elsewhere, he had to go through Judy Fung. She would reassign and cancel Dr. Noble's scheduled surgeries arbitrarily. She also controlled communications with Dr. Fung. So, if Dr. Noble wanted to reach his colleague and senior partner he had to go through Judy Fung. Defendants knew of Judy Fung's unusual role, her offensive behaviors and ratified her decisions and behaviors in spite of complaints from Dr. Noble and regardless of the dangers her intermeddling posed for patient safety. Her access to Patient

Health Information was a violation of HIPPA.

27.    **Dr. John Talieh** is a thoracic surgeon in Modesto, California now affiliated with Sutter Gould. Plaintiff alleges that Dr. Talieh acted in the course and scope of his employment with Sutter Gould and that his conduct, including his racially discriminatory and other wrongful conduct, was known to Sutter and Sutter Gould who ratified that conduct. John Talieh further acted in concert with, aiding and abetting and in conspiracy with other persons to accomplish the unlawful conduct perpetrated against Dr. Noble.

28.    **Does 1-100** are individuals and business entities, whose name, capacity and/or liability is not sufficiently known to include them by name. When their true names and capacities are known, this complaint will be amended to reflect the same.

29.    Defendants and the individuals acting in concert with them acted with knowledge of the wrongful conduct of each other. The wrongful conduct of individuals was known to Sutter and Sutter Gould and ratified by each. All conduct alleged herein by individuals was done within the course, conduct and scope of their relationship to Sutter Health and Sutter Gould. The individuals Sutter Health and Sutter Gould acted as civil conspirators with the specific intent to further the wrongs set forth herein. The individuals and Gould acted deliberately to aid and abet the wrongdoing as set forth herein.

## IV.    <u>JURISDICTION</u>

**28  U.S.C. § 1331 (Federal Question) / 28 U.S.C. § 1367 (Supplemental)**

30.    Claims are hereby brought under 42 U.S.C. 1981, a law of the United

States. This Court has supplemental jurisdiction pursuant to 42 U.S.C. 1367 over all other

claims as they arise from thesame facts and circumstances that are contained in the claims

under 42 U.S.C. 1981 and Title VII.

**28  U.S. Code § 1332**

31.      Plaintiff is a resident of Oregon State. Defendants Sutter, Sutter Gould,

SVMF, and Sutter Memorial Medical Center of Modesto are California corporations;

Defendants Lit K. Fung, Judy Fung, and John Talieh are California residents. The claims

by individual count and in the aggregate exceed $75,000.00

**V.      VENUE**

32.      Defendant Sutter Health is a corporation with its headquarters in Sacramento,

California.  Therefore venue is proper under 28 U.S.C. § 1391(b)(1).  All corporate

entities are substantially tied to, owned by or controlled by Sutter Health (as defined in

paragraph 19 of this complaint).  As set forth in paragraph 17 of this complaint, Sutter

utilizes various entities, names and subgroups with Sutter being the controlling entity for

all.

**VI.      ESSENTIAL BACKGROUND: DOCTORS ARE SUBJECT TO
           INSTITUTIONAL BLACKBALLING VIA THE CREDENTIALING
           PROCESS**

33.      The average physician fills out approximately 12 professional applications

per year. These applications are vital to maintain the doctor's reputation and livelihood. The

applications include state medical board licensure, employment, membership in hospital

medical staffs (giving the rights to the doctors to practice and perform surgery at the

hospital), membership in medical and specialty societies (including Board Certification),

malpractice insurance, and inclusion in health plans and health insurers provided panels

(which is economically vital to physicians).

34.     These applications are vetted in a process known as "credentialing". Credentialling entails checking the doctor's educational and employment background, as well as the doctor's disciplinary history at all hospitals where the doctor has had medical staff privileges. Another essential part of credentialling is checking with the state medical licensing board wherever the doctor has held a license to see if there has been any disciplinary action taken against the doctor. Of paramount importance in credentialling is the National Practitioners' Data Bank, a governmentally maintained data base of all physicians who have settled malpractice suits or have been the subject of disciplinary action by a state licensing board or any hospital. Under Federal law this Data Bank **must** be checked before a state licensing board issues or renews a physician's license. Likewise, before granting a physician privileges to operate at any hospital, the hospital **must** check the Data Bank, as must medical groups, specialty societies, and board certificating organizations. Most importantly, health insurers and health plans check the Data Bank before putting doctors on their provider panels. Some insures exclude doctors automatically if they have been reported to the Data Bank.

35.     If the official website of the licensing boards or the NPDB have wrong, misleading, or unfair information, they can ruin a doctor's reputation and make it very difficult for the doctor to get a job or be credentialed by hospitals and health plans, etc. Reporting, therefore, has a direct impact on the compensation a doctor can earn.

36.     Sutter and Sutter Gould routinely used the threat of reporting a doctor to the California Medical Board and/or the Data Bank to intimidate doctors and "keep them in line." Management regularly collects negative secret reports about doctors, which they

reveal only when they want to threaten the doctor with reportable discipline. Sutter and Sutter Gould also fabricate allegations against doctors for the purpose of intimidating them. In many instances the allegations against Black doctors are race-based and arise out of Defendants' culture of systemic racism.

37.     Virtually all credentialling applications, filed out by doctors, have so-called "attestation questions" that require the doctors to self-disclose any negative information about themselves. These attestations, very frequently, ask whether the doctor has ever been investigated by an employer, hospital, or state licensing board. The doctor must answer the question truthfully -even if the investigation concluded that the doctor did nothing wrong. Thus, a mere accusation – whether or not it is true – can trigger an investigation which stains the doctor's reputation for life.

38.     Thus, credentialing is an impenetrable web. Each institution that is checked can share its files with the credentialing institution. The doctor never sees what is shared, but to be credentialed the doctor must agree to this file sharing. These unfounded allegations and unproven charges travel from institution to institution, tainting doctor's reputations without them even knowing it. For physicians, truly, the power to accuse is the power to destroy.

39.     The use of false or unsubstantiated allegations against a doctor by hospitals or medical groups is called sham peer review. Normally, an accused physician is entitled to a hearing to prove whether the allegations are true or false, but Sutter and other Defendants evade those rights by summarily suspending the doctor and giving the doctor a hearing only after the discipline has been imposed. Summary suspensions are only supposed to be used when there is a threat of "imminent" patient harm. Sutter and Sutter Gould threaten to impose summary suspensions even when there is no imminent threat to patient care. If the

suspension lasts long enough it must be reported to the California Medical Board and Data Bank. Dr. Noble was threatened with a baseless summary suspension.

40.        Sutter and Sutter Gould have taken sham peer review one step further by using a form of discipline (or threatened discipline) known as a Performance Improvement Plan or PIP. A PIP can be imposed on a doctor without specific allegations and without giving the doctor any opportunity to disprove the PIP. Sutter and Sutter Gould impose Draconian and often senseless PIPs on the doctor and threaten suspension or termination if the doctor does not comply. Defendants' PIPs disproportionately target Black and minority doctors. First, the doctors are usually drawn aside by management and told they are "in trouble" without any further detail. They are told they should voluntarily submit to a written PIP, and told they have to agree and sign it. Doctors do not know that PIPs are a form of discipline. In cajoling doctors to volunteer for this discipline, Sutter and Sutter Gould use phrases like "it's good for you" and "everybody goes through it." Both phrases are false. They couple these lies with the representation that the PIP will not be reported to the Medical Board or Data Bank, but that is a deceptive half-truth: While the PIP itself is not reportable, it becomes reportable if the doctor resigns while still under the PIP. So, as with an "investigation," the doctor is trapped.

41.        The terms of PIPs imposed by Sutter and Sutter Gould are often open-ended, vague, debasing and humiliating. They require the doctor to "report" to an overseeing doctor who treats the accused physician with disrespect and condescension. The accused must obey the whims of the overseeing physician, as if they were a "slave." Such forms of discipline are abusive and especially offensive for Black doctors.

## VII.    THE SHORTAGE OF CARDIO-VASCULAR SURGEONS

42.        There is a severe national shortage of highly trained surgical subspecialists, including cardiothoracic surgeons like Dr. Noble.  Cardiothoracic surgeons traditionally have to go to four years of medical school, do five additional years of residency in general surgery, then do an additional two to five years of training in heart and lung surgical fellowships. Each year, approximately 100 new cardiothoracic surgeons come out of training. With retirement, burn-out and COVID, the total number of heart surgeons is barely staying even. This shortage motivates the medical groups to try to bind the service of the heart surgeon to the group, but because they have high salaries, groups often use sham discipline and PIPs to retain heart surgeons.

## VIII.   FACTS COMMON TO ALL CAUSES OF ACTION

43.        **Plaintiff's Protected Status:**  PLAINTIFF is a Black male.

44.        Dr. Noble joined the Gould Cardiothoracic Surgery department in 2018. He submitted application for medical staff membership and was granted full privileges in his specialty at both Memorial Medical Center Modesto ("MMC") andDoctors Medical Center of Modesto Hospitals ("DMC"). These privileges allowed Dr. Noble to operate at the hospital. Prior to his arrival, most of the heart surgeries at MMC and within the Gould Medical Group were performed by Dr. Lit K. Fung, a senior partner at Gould and the head of the Cardiothoracic Surgery department.

45.        Dr. Lit K. Fung and the surgeons working with him had a high rate of negative outcomes and poor comparative surgery results compared to national averages.

46.        Dr. Lit K. Fung had also failed to keep current on newer and more precise surgery techniques such as the use of robotics.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

47.      Dr. Noble was told during recruitment that his role was to introduce more modern skill sets, equipment and techniques to improve Sutter/Gould's record of poor outcomes.

48.      Dr. Fung self-describes himself as primarily a thoracic surgeon whose secondary emphasis was vascular surgery. Thoracic surgery refers to operations on organs in the chest, including the heart, lungs and esophagus. In general, thoracic surgeons mainly treat lung cancer, lung disease, and diseases in the esophagus and chest wall. Cardiothoracic surgeons, by contrast, operate on the lungs and esophagus but also focus on the heart. Vascular surgery focuses on the vascular system, or arteries, veins and lymphatic circulation. Dr. Noble had more specialized training in heart surgery than Dr. Fung.

49.      Given the fact that Dr. Fung was reaching an age where many cardiothoracic surgeons retire and his emphasis was on non-heart related aspects of medicine, it made sense to Dr. Noble that he would be integrated into this medical group, introduce more modern cardio techniques and improve their performance ratings in terms of patient outcomes.

50.      Dr. Fung, however, did not embrace Dr. Noble and from the outset barred him from participating in complex surgeries, failed to train Dr. Noble in areas where Dr. Fung's knowledge was current, and blocked Dr. Noble's attempts to obtain more modern surgical supplies and equipment.

51.      The attacks were insidious and used racial stereotypes and tactics that belittled Dr. Noble as a person and a physician in both the eyes of the public and staff.

52.      Immediately upon Dr. Noble's arrival at MMC, Gould and Dr. Fung took

steps to hide the fact that Dr. Noble was African American. Medical groups regularly have pictures of their physicians available on brochures and the internet. Patients read about the doctors and look at their faces presumably to see if the doctor seems intelligent, skillful, and compassionate. The marketing for Dr. Noble was almost non-existent. It took months for Dr. Noble's name to appear on the Gould website, and when that finally happened Sutter Gould failed to include pictures of Dr. Noble.

53.     Dr. Fung and Sutter Gould repeatedly obstructed Dr. Noble's attempts to establish and build his practice by preventing him from building a patient base. It is normal to promote a new surgeon in the medical community by sending out notices of his/her qualifications and by introducing him/her personally to physicians who might later refer patients to that surgeon, run notices in newspapers, have the doctors do grand rounds at the hospital, and generally make the physician visible in the community. This did not happen with Dr. Noble. He was kept hidden as if his race were an embarrassment to those at Sutter Gould in charge of Dr. Noble's career.

54.     A respected surgeon would normally have an office with the surgeon's name on the door. This helps people find the office and it indicates to patients that the doctor has his own office. Dr. Fung refused to put Dr. Noble's name on the door. Dr. Noble's office was tucked away so that it was difficult for to locate him. It was out of the way so that patients going to other doctor's offices would not likely stumble upon the black man sitting in Dr. Noble's office. Also, as his name was not on the door, patients seeing this man of color might not think he was a doctor.

55.     Despite his stellar surgical achievements – and years of experience – Dr. Noble was treated as a novice and he was excluded from participation in the major medical

activities of the group. Implying that this African American surgeon did not deserve the position that he had been hired for, Dr. Fung openly disparaged Dr. Noble and prevented him from doing surgical procedures for which he wasfully trained and credentialed.

56.      Never did any physician or administrator at Gould oppose Dr. Fung or come to Dr. Noble's defense, in spite of Dr. Noble's repeated requests and complaints. At this time, as degraded as Dr. Fung's surgical skills had become and as poor as the hospital survival and outcome results were, Dr. Fung was still the main income source for the cardiothoracic surgery department at Sutter Memorial.  He was a major cash cow and regardless of his boorish behavior, Sutter Gould had a strong financial interest in supporting him.

57.      Sutter Gould was staffed by many substandard and poorly educated physicians  who were marginal in their abilities and qualifications. Financially, this group was highly dependent upon Sutter Gould and Lit Fung for their professional careers and income. They marched in lockstep to the instructions, both express and implied, of Dr. Fung, Sutter Gould, and Sutter. They froze Dr. Noble out of medical interactions and subverted him with great frequency and by extension expanded the racist culture of Sutter Gould and Sutter Memorial.

58.      As the early surgical data was presented it became clear that even in a second-tier hospital, which lacked supplies and had poor surgical support, Dr. Noble's outcomes were as good as or better than national averages. This contrasted sharply with the high failure rates of Dr. Fung and the other surgeons. Rather than promote Dr. Noble and provide better patient care Sutter Gould and Dr. Fung increased their interference with Dr. Noble by limiting his surgeries and by giving him second rate surgical teams in order

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

to make his success rate drop.

59.     Dr. Noble saw other physicians, intimidated into complicity, snicker as he attempted to speak with Dr. Fung about necessary changes to improve patient care and safety.  It was a running joke that Dr. Fung would not even speak to Dr. Noble unless Dr. Noble called or e-mailed Dr. Fung's wife and made an appointment – literally. Dr. Fung's wife was not an employee of Gould or Sutter, but Dr. Noble – who was supposed to be Dr. Fung's partner – had to communicate through Dr. Fung's wife, who was rude and often blocked communication. Insofar as she was allowed to interject herself and impede medical conversations, she was acting as an agent of Dr. Fung, Sutter, and Sutter Gould. This arrangement was bizarre and demeaning to Dr. Noble.

60.     Prior to Dr. Noble's arrival, Dr. Fung took 90% of the cardiac cases at MMC. Dr. Noble was more recently and better trained in heart surgery than Dr. Fung, but after Dr. Noble's arrival Dr. Fung continued to take 90-plus percent of cardiac cases. Sutter Gould made no effort to redistribute the cases, even though Dr. Noble's career advancement and salary depended upon his ability to do a fair number of heart surgeries. Dr. Noble's career clock was ticking. If he remained at MMC doing a low number of serious surgeries, his skill level would not be advanced and his growth in the medical community was thwarted.

61.     To damage and destroy Dr. Noble, Sutter Gould and Dr. Fung set forth on a course that prevented Dr. Noble from leaving Sutter Gould without suffering enormous harm to his reputation and employability, Dr. Noble was trapped while his career was being destroyed by Sutter Gould and Dr. Fung's malicious and racially biased conduct.

62.     Among the obstructions placed in the way of Dr. Noble was the fact that Gould deliberately left him off the emergency room call schedule. Physicians assigned to

take call would be paid a reasonable amount of money for being available to see heart and lung patients who showed up in the ER. Doctors on call not only were able to bill fees for procedures they did, but they were also paid a stipend for each shift of call they did. More importantly, the on-call physician would have access to new cases that came into the hospital on an emergency basis. Dr. Fung and his wife, Judy Fung, controlled the call schedule, and systematically excluded Dr. Noble from that schedule. Dr. Noble repeatedly asked Dr. Fung to place his name on the schedule and Dr. Fung refused. Dr. Fung gave no reason, he just said "not yet." No policy or rule promulgated by any of the Defendants authorized or sanctioned Dr. Fung's discriminatory act.

63.     Dr. Noble discussed his exclusion from the call schedule with Dr. John Talieh. Dr. Talieh was Sutter Memorial's Chair of Credentialing as well as Chief of Surgery and Department Chair. In those capacities he was a member of the evaluation/decision-making team along with the Physician Compensation Committee, and a member of the Peer Review Committee. He had the ability to intervene. However, he was financially dependent upon Dr. Fung and had historically received Dr. Fung's overflow cases. Dr. Talieh justified Dr. Noble's exclusion claiming that Dr. Noble had "limited experience in vascular surgery," which was not true. Dr. Noble was told he could not take call until Dr. Talieh "felt comfortable." This statement was untrue and many physicians who were placed "on call" had far less experience and qualifications.

64.     These statements had no factual basis and were simply meant to justify behavior that was predatory and racist. Nonetheless, Dr. Noble attempted to work with Dr. Talieh to no avail.

65.     Dr. Noble even offered to take a second position to Dr. Fung during

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

surgeries in order to prove to Dr. Talieh and Dr. Fung that he was fully qualified. Dr. Fung refused to do this, and he disparaged Dr. Noble by stating that because vascular surgery cases are highly litigious, and he did not want to "go down" because of a mistake Dr. Noble might make. As Dr. Fung did not permit Dr. Noble to even assist on a surgery, it was clear that he had no intention of allowing Dr. Noble to be the primary surgeon on any significant case or to ever have a normal "on call" schedule or otherwise build the professional practice promised to him when he was recruited.

66.     Dr. Fung and Dr. Talieh deprived Dr. Noble of Emergency Room call for his entire 1.5-year tenure, even though Dr. Noble had full privileges at Sutter Memorial Medical Center Modesto.This was a gross violation of Dr. Noble's rights as a physician that impugned his reputation and demonstrated that he was singled out for mistreatment by Dr. Fung. Emergency Room call is an essential practice-building mechanism for cardiothoracic surgeons. This exclusion directly contributed to Dr. Noble's difficulty building his practice, as well as isolating him even further professionally. It kept him from developing professional relationships with ER doctors and receiving referrals from them.

67.     Dr. Noble  repeatedly reached out to those in leadership positions at the hospital and Sutter Gould to discuss the issues he was facing.

68.     Dr. Noble had conversations with Dr. David Roberts, the Regional Medical Director of Cardiovascular Services at Sutter Health Sacramento, regarding concerns with on-boarding, his inability to take calls, the lack of support he was receiving, and the overall racism he encountered.

69.     Dr. Noble spoke with Chris Rogers, the Operations Director of Surgical Care, about the treatment he was facing had on his career.

70.     Dr. Noble spoke with Dr. Bruce Laverty, the Sutter MMC Chief Medical Officer, regarding the lack of cardiac cases and the effect on both his career and the quality of care for patients at the institution.

71.     Dr. Noble spoke with Richard Leal, Gould's Director of Growth and Strategy, about these same issues.

72.     Because Dr. Noble was kept from building a practice and presence at Sutter Memorial and within Sutter Gould, Dr. Fung continued to monopolize the department, and complication rates remained high. Thus, as a direct result of this discrimination, patients were deprived of the best possible cardiothoracic care.

73.     On March 8, 2019, Dr. Noble even reached out to Todd Smith, Gould's Medical Director, to schedule a meeting, which ultimately took place on April 19, 2019. At this meeting, Dr. Noble addressed these many issues including the specific fact that Dr. Fung, individually and through his wife, were perpetuating inequitable referral patterns, and as a result Dr. Noble had low surgical volume and a lack of meaningful surgeries that were reassigned, lower-level surgical teams and other matters including inadequate surgery room equipment. Nothing was done to remediate the discrimination and disparate treatment Dr. Noble received or to address Dr. Noble's concern about the quality of patient care.

74.     Dr. Noble also recognized that Dr. Fung was lobbying his friends in the anesthesia department to gossip about and disparage Dr. Noble. There was literally a group of doctors who, deliberately and in concert with each other, were undermining Dr. Noble's career.

75.     Despite Dr. Noble's many conversations with supervisors, nothing was done to alleviate the discrimination and obstructions. In fact, it got worse.

76.     In the Spring of 2019, Dr. Noble faced yet another arbitrary reduction of his role in performing cardiac cases. This was done by cardiologist, Dr. Amar Pohwani, and an anesthesiologist, Dr. Linda Hormozi, both of whom relied financially on their relationship with  Dr. Fung.

77.     Both of these physicians received their medical degrees from non-U.S. based facilities. In fact, Dr. Hormozi's school was a for-profit, low prestige medical school in Barbados. Their lack of academic qualification made them highly vulnerable and in low demand in the medical community. They protected their jobs by supporting Dr. Fung's racist attacks against Dr. Noble to an extreme degree.

78.     On March 21, 2019, Dr. Hormozi was the anesthesiologist of record for a procedure Noble was scheduled to perform. However, she refused to put the patient to sleep, citing baseless and illegitimate concerns over Dr. Noble's privileges to perform the procedure. Her actions constituted patient abandonment.

79.     Soon thereafter, Dr. Talieh informed Dr. Noble about a so-called "letter of concern" from the anesthesia department about Dr. Noble's clinical abilities. This signaled to Dr. Noble that "the gloves were off" and that the full onslaught had begun. But as shown below, Sutter Gould kept Dr. Noble a captive at Sutter Gould, and he had to endure the attacks without the ability to ever face his attackers or leave. Dr. Noble spoke with the anesthesiology chief, who said this "letter of concern" was not in fact a letter, but rather a list of patient names and cases that needed to be reviewed. Dr. Noble never saw any 'letter of concern," or any list of patients. Ultimately, neither Sutter Health Memorial nor Sutter Gould ever proved that Dr. Noble's care was in any way substandard. To the contrary, the statistics showed Dr. Noble's quality of care was better than any other

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

surgeon in his specialty at Sutter Gould.

80.     This supposed list, with Dr. Fung's knowledge and approval, was forwarded to the Quality and Safety Department at Sutter Gould. Despite this attack, Dr. Noble attempted to work within Sutter Gould to deal with what was happening to him.

81.     Dr. Noble spoke with the Anesthesia Department Chair to address his concerns about the lack of transparency around this "letter" – which could affect patient care and his reputation.  No matter who he spoke to, the person listened and nothing was done to address Dr. Noble's questions or concerns. Dr. Noble was like James Baldwin's Invisible Man.

82.     Dr. Noble reached out to Dr. Fung in an effort to discuss the matter, but Dr. Noble was not even given an appointment to speak with Dr. Fung.  He was ignored.

83.     In May 2019, Dr. Noble was locked into working at Gould and could not leave  without destroying his career, due to the threat of a National Practitioner Data Bank Report. (The National Practitioner Data Bank is a centralized registry of doctors with malpractice or disciplinary histories. Every physician employer, hospital, or health plan is required by law to check the Data Bank before credentialing a doctor. It has the power to ruin a doctor's career (45 C.F.R. § 60.17). Under Data Bank guidelines, a physician who resigns while under a PIP or under investigation must be reported.)

84.     Therefore, once the letter of concern was written, Dr. Noble was in the process of being frozen at Gould. Days later, he was notified by Sutter Memorials Quality and Safety Department that seven of his cases from Dr. Fung's department were under review. At this stage, Dr. Noble was trapped.  He could not resign without being reported. Dr. Fung

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

and Gould could abuse him to their heart's content, and he had to endure it.

85.     There was no basis for the complaints against Dr. Noble, and they were not filed for any purpose other than to trap Dr. Noble and subject him to discrimination and abuse.

86.     Meanwhile, the degradation of Dr. Noble's career increased. Just four days after the charges went forward, the schedule for TAVR procedures was changed. (TAVR is a way of inserting an artificial valve into a damaged heat valve without removing it.) TAVR was a critical portion of Dr. Noble's training at Ohio State University, and he stayed current and proficient in techniques during his time in the Navy working with one of the highest-volume community programs in the Mid-Atlantic region Sentara Norfolk General Hospital. Despite having more skill and training in TAVR procedures than Dr. Fung, Dr. Noble was removed from the TAVR schedule and replaced by Dr. Fung.

87.     Even when Dr. Noble was allowed to perform TAVR, he was attacked. The most gross attacks were perpetrated by non-Black doctors who graduated from marginal medical schools and who were therefore highly dependent upon Dr. Fung and Dr. Talieh. In this case August 13, 2019, Nurse Practitioner Mari Rossini, the NP-Program Coordinator of the Structural Heart Clinic at MMC, decided that Dr. Noble needed a proctor during TAVR surgery. Nurses have no authority to make proctoring decisions. Only doctors may do so through medical staff processes laid out in the medical staff bylaws.

88.     Sutter Gould parlayed these baseless attacks on Dr. Noble to their financial advantage. On September 4, 2019, Dr. Noble was notified that his salary would be cut by 23

percent, putting his earnings below the 25th percentile of what a cardiothoracic surgeon

normally makes. No justification was provided.

89.     In an attempt to understand this abrupt salary reduction, Dr. Noble met with

Dr. Peterson on September 25, 2019. Dr. Peterson told him that although his "compensation

is guaranteed, the amount is not." He further stated that the Physician Compensation

Committee based its decisions on "metrics" and "expectations," which were never conveyed

to Dr. Noble. Unbeknownst to Dr. Noble, Dr. Fung and Dr. Talieh were members of the

Physicians Compensation Committee.

90.     Dr. Noble's ability to meet any metrics or expectations had been crushed by

the discriminatory abuses of Dr. Fung and Dr. Talieh. One metric which appears not to have

been considered was the success rate in surgery, for which Dr. Noble met national standards

while Dr. Fung and the other surgeons did not.

91.     On September 29, 2019, Dr. Talieh tried to coerce Dr. Noble into

"voluntarily" agreeing to a Performance Improvement Plan ("PIP"). This agreement

would require Dr. Noble not to exercise vascular surgery privileges and to agree to

concurrent proctoring on all cardiac and thoracic cases for six (6) months, complete a

master's Course in vascular surgery within six (6) months, and, at the end of the six-

month period, a committee would reevaluate his progress.

92.     The "PIP" was a trap. Any resignation during the pendency of a PIP is

considered a "resignation while under investigation" and is reportable to the National

Data Base. If Dr. Noble had agreed to the PIP, he would have admitted the correctness of

the racially motivated false assessments of his skills.

93.     Dr. Noble refused the to sign PIP.

94.     On October 8, 2019, Dr. Noble received a letter from Dr. Kanthi Kiran, the Chief of Staff, and an Emergency Room physician. Dr. Kiran notified him that the Medical Executive Committee had initiated an investigation into the six remaining cases under review. This committee was formed without any input from Dr. Noble. This same letter inaccurately claimed that Dr. Noble had agreed to a PIP plan.

95.     Dr. Noble hired an attorney and notified Sutter Gould via email that Dr. Noble had not agreed to be "voluntarily proctored on all cases."

96.     The "investigation" purported to focus on patient safety even though, at this time Memorial had very poor outcome and complication rates compared to national averages because of its reliance on Dr. Fung (See Exhibit K).

97.     Sutter Memorial's mean and median cardiopulmonary bypass time was approximately 40% longer than the national average. The longer the bypass time, the more the patient is exposed to complications and even death.

98.     A recognized sign of complication is whether the patient has to come back to the hospital within thirty days. Sutter Memorial's thirty-day readmission rate for cardiothoracic cases was approximately twice the national average. Likewise, other measurements of cardiothoracic surgeries at Sutter Memorial were abysmal.

99.     Dr. Noble's numbers were much higher and in line with the national average. Most of the national statistics drawn from university hospitals and major heart centers. Dr. Noble's statistics were a remarkable accomplishment given the substandard physical facility and second-rate support teams at Sutter Memorial provided to him and his patients.

100.    Incredibly, on December 5, 2019 Dr. Peterson announced that Dr.

Noble's salary was being reduced again.  In less than one year his salary had been cut by 60%. This made Dr. Noble the lowest paid full-time cardiothoracic surgeon in the country.

101.    The compensation "committee" imposing these cuts included Dr. Fung and Dr. Talieh.  The cuts to Dr. Noble's salary increased their income by reducing his payout. They also benefited economically by shifting his work to themselves.

102.    Dr. Noble's contract,  Exhibit C, has his salary set out in attachment A-1.  It allows salary adjustments once a year, so these multiple cuts were contrary to the contract. But Dr. Noble could not resign because he was "under investigation". Almost any indignity had to be endured.

103.    Specifically, the contract document states in part that "... a compensation review maybe conducted after one year of employment and/or annually thereafter during any extended term of this Agreement. Any change in compensation will be based on Employee's level of activity and commitment to employer, as well as considerations of quality service." However, Defendants were doing everything possible to limit Dr. Noble's "activity" and Dr. Noble's complaints about the discriminatory treatment he was suffering were viewed as disloyal or lacking in "commitment to the employer." In cutting Dr. Noble's salary, the Compensation Committee disregarded the fact that Dr. Noble's quality of care exceeded that of other Sutter Gould surgeons in his specialty.

104.    Ultimately, Dr. Noble was made to suffer through nearly ten months of abuse while the peer review was pending.  It ended in February 2020 and his coerced servitude was ended.

28                    COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

105.    In March 2020, Dr. Noble was finally able to resign from Sutter Gould and the

medical staff of Sutter Memorial.

106.    Defendants' wrongful conduct herein caused Plaintiff to suffer and incur

general damages, special damages, and attorney's fees (as damage items).  Plaintiff prays

for these items as part of his damages.

107.    Plaintiff further seeks attorney's fees for prosecuting this action,

attorney's fees as allowed by statute, such costs, multipliers, statutory remedies, and other

relief as allowed by lawand/or statute.

108.    Defendants' actions were oppressive, fraudulent, and malicious. Whereby

Plaintiff seeks punitive damages within this case.

**EXHAUSTION OF REMEDIES**

109.    Dr. Noble has exhausted all internal remedies required by Defendants'

employment contract or bylaws.

110.    Exhibit L is a "Right to Sue" letter from the DFEH evidencing the

compliance with the administrative process that is a condition precedent to the right to sue

on that count.

**COUNT 1**
**(U.S.C. 1981)**

111.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully

herein.

112.    Plaintiff is a member of a protected class under 42 U.S.C. 1981 and

the conduct alleged herein was motivated by racial bias, animus and prejudice.  It was

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

designed to harm, damage and impair the contractual rights of Dr. Noble with various

entities affecting his livelihood.

113.    The contracts which were interfered with were his contracts with

Sutter Gould and his hospital privileges at Sutter MMC as well as its related Sutter

affiliated entities.

114.    Defendants Sutter Gould and Fung interfered and impaired the

performance of each of these and their conduct was the direct and but-for cause of the

harms and damages alleged herein.

115.    As set forth herein and according to further proof, the conduct of

Defendants and each of them constituted harassment, retaliation, discrimination, and

interference with the execution of the contracts referenced herein due to race.

116.    The conduct herein substantially impaired the value of the contracts and

further led to the constructive discharge of Dr. Noble from Sutter Gould and constructively

forced the termination of his privileges at the hospitals set forth herein.

117.    The policies and practices set forth herein were done with a discriminatory

intent.

118.    Plaintiff seeks general damages, special damages, and punitive damages

according to proof; as well as statutory damages according to proof; costs, attorney's

fees and such further relief including, but not limited to, injunctive relief as allowed by

law.  Defendants' misconduct was committed intentionally, in a malicious, despicable,

oppressive, fraudulent manner, entitling Plaintiff to punitive damages against Defendants.

The conduct was done with a conscious disregard of the rights and interests of Plaintiff

119.    The conduct of each Defendant individually and in concert were malicious,

oppressive and/or in reckless disregard of the Plaintiff's rights. The conduct was accompanied by ill will, spite and/or for the purpose of injuring the Plaintiff.

## COUNT 2
### (Violation of FEHA (Government § 12900, et seq.))
### (Race Discrimination)

120.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

121.    Defendants' conduct, both individually and in deliberate conspiracy to cause harm and/or to violate the law as alleged herein, violated FEHA, Government Code section 12900, et seq., and Defendants committed unlawful employment practices, including by the following bases for liability:

    a.  Discharging, barring, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on the basis of Plaintiff's race, national origin, and/or color, in violation of Government Code section 12940(a);

    b.  Harassing Plaintiff and/or creating a hostile work environment, in whole or in part on the basis of Plaintiff's race, national origin, and/or color, in violation of Government Code section 12940(j);

    c.  Failing to take all reasonable steps to prevent discrimination and harassment based on race, in violation of Government Code section 12940(k);

    d.  Retaliating against Plaintiff for seeking to exercise rights guaranteed under FEHA and/or opposing Defendants' failure to provide such rights, in violation of Government Code section

12940(h).

122.    As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial lossesof earnings and other employment benefits.

123.    As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to his  damage  in  asum according to proof.

124.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

125.    Pursuant to Government Code section 12965(b), Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

126.    Defendants' misconduct was committed intentionally, in a malicious, despicable,oppressive, fraudulent manner, entitling Plaintiff to punitive damages against Defendants.  Theconduct was done with a conscious disregard of the rights and interests of Plaintiff.

## COUNT 3
### Violation of FEHA (Government § 12900, et seq.)
### (Race Harassment)

127.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

128.    Defendants' conduct, both individually and in deliberate conspiracy to cause harmand/or to violate the law as  alleged herein.

129.    Defendants' conduct, as alleged, violated FEHA, Government Code section 12900, et seq., and Defendants committed unlawful employment practices, including by the following bases for liability:

e.   Harassing Plaintiff and/or creating a hostile work environment, in whole or inpart on the basis of Plaintiff's race, national origin, and/or color, in violation of Government Code section 12940(j);

f.   Failing to take all reasonable steps to prevent discrimination, harassment, and retaliation based on race, national origin, and/or color, in violation of GovernmentCode section 12940(k)

130.    As a proximate result of Defendants' willful, knowing, and intentional harassment of Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

131.    As a proximate result of Defendants' willful, knowing, and intentional harassment of Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to his damage in a sum according to proof.

132.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

133.    Pursuant to Government Code section 12965(b), Plaintiff is entitled to recover reason-able attorneys' fees and costs (including expert costs) in an amount according to proof.

134.    Defendants' misconduct was committed intentionally, in a malicious, despicable,oppressive, fraudulent manner, entitling Plaintiff to punitive damages against Defendants.

## COUNT 4

### Violation of FEHA (Government Code § 12940(k))
### (Failure to Prevent Discrimination, Harassment, and Retaliation)

135.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

136.    Defendants' conduct, both individually and in deliberate conspiracy to cause harmand/or to violate the law as alleged herein.

137.    At all times herein mentioned, FEHA, Government Code section 12940(k), was in full force and effect and was binding on Defendants. This statute states that it is anunlawful employment practice in California for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Prior to filing the instant Complaint, Plaintiff filed a timely administrative charge with the DFEH and received a right-to-sue letter.

138.    During the course of Plaintiff's employment, Defendants failed to prevent their employees from engaging in intentional actions that resulted in Plaintiff's being treated less favorably because of Plaintiff's protected status. During the course of Plaintiff's employment, Defendants failed to prevent their employees from engaging in unjustifiedemployment practices against employees in such protected class and/or other protected classes as well as Plaintiff's protected class. During the course of Plaintiff's employment,Defendants failed to prevent a pattern and practice by their employees of intentional discrimination and harassment on the bases of race, national origin, color, sexual orientation, marital status, and/or other protected statuses or protected activities.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

139.    Plaintiff believes and on that basis alleges that his race and/or other protected status and/or protected activity were substantial motivating factors in Defendants' employees' discrimination against and harassment of him.

140.    As a proximate result of Defendants' willful, knowing, and intentional misconduct, Plaintiff has sustained and continues to sustain substantial losses of earnings andother employment benefits.

141.    As a proximate result of Defendants' willful, knowing, and intentional misconduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, andphysical and mental pain and anguish, all to his damage in a sum according to proof.

142.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

143.    Pursuant to Government Code section 12965(b), Plaintiff is entitled to recover reason-able attorneys' fees and costs (including expert costs) in an amount according to proof.

144.    Defendants' misconduct was committed intentionally, in a malicious, despicable,oppressive, fraudulent manner, entitling Plaintiff to punitive damages against Defendants.

### **<u>COUNT 5</u>**
**Wrongful Constructive Termination of Employment in Violation of Public Policy**
**(LaborCode § 1102.5; FEHA, Government Code § 12900, et seq.)**

145.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

146.    Defendants' conduct, both individually and in deliberate conspiracy to cause harm and/or to violate the law as alleged herein.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

147.    Defendants constructively terminated Plaintiff's employment in violation of various fundamental public policies underlying both state and federal laws. Specifically, Plaintiff's employment was terminated in part because of his protected status, including his race, and his complaints about inappropriate and unfair practices. These actions were in violation of FEHA, the California Constitution, and California Labor Codesection 1102.5.

148.    As a proximate result of Defendants' wrongful constructive termination of Plaintiff's employment in violation of fundamental public policies, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, allto his damage in a sum according to proof.

149.    As a result of Defendants' wrongful termination of his employment, Plaintiff has suffered general and special damages in sums according to proof.

150.    Defendants' wrongful constructive termination of Plaintiff's employment wasdone intentionally, in a malicious, fraudulent, oppressive, fraudulent manner, entitling Plaintiff to punitive damages.

151.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

152.    Pursuant to Code of Civil Procedure sections 1021.5 and 1032, et seq., Plaintiff is entitled to recover reasonable attorneys' fees and costs in an amount according to proof.

### COUNT 6
**Violation of FEHA (Government Code § 12900, et seq.)**
**(Retaliation for Engaging in Protected Activity)**

153.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully

herein.

154.    Defendants' conduct, both individually and in deliberate conspiracy to cause harm and/or to violate the law as alleged herein Plaintiff's complaints to Defendants about harassment, race and abusive treatment is protected by FEHA, Government Code section 12900, et seq. These protected matters/conduct were motivating factors in Defendants' decision not to support, train, to cut pay and to otherwise diminish the job and employment of and/or to take the various other adverse employment actions, including constructive employmenttermination, against Plaintiff.

155.    Defendants' conduct, as alleged, violated FEHA, Government Code section12900, et seq., and Defendants committed unlawful employment practices, including by the following, separate bases for liability:

g.   Barring, discharging, refusing to transfer, retain, hire, select, and/or employ, and/or otherwise discriminating against Plaintiff, in whole or in part on thebasis of Plaintiff's actual and/or perceived sexual orientation, marital status, race, and/or other protected characteristics, in violation of Government Codesection 12940(a);

h.   Retaliating against Plaintiff for his complaints to Defendants about the harassment he was experiencing by taking adverse employment actions against him, in violation of Government Code section 12940(f);

i.   Harassing Plaintiff and/or creating a hostile work environment, in whole or in part on the basis of Plaintiff's actual and/or perceived sexual orientation,marital status, race, and/or other protected characteristics, in

violation of Government Code section 12940(j);

j.  Failing to take all reasonable steps to prevent discrimination, harassment,and retaliation on the basis of actual and/or perceived sexual orientation, marital status, and race, in violation of Government Code section 12940(k);

k.  Retaliating against Plaintiff for seeking to exercise rights guaranteed under FEHA and/or opposing Defendant's failure to recognize such rights, including theright to be free of discrimination, in violation of Government Code section 12940(h).

156.    As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

157.    As a proximate result of Defendants' willful, knowing, and intentional discrimination against Plaintiff, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and physical and mental pain and anguish, all to his damage in a sum according to proof.

158.    Defendants' misconduct was committed intentionally, in a malicious, despicable,oppressive, fraudulent manner, entitling Plaintiff to punitive damages against Defendants.

159.    Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

160.    Pursuant to Government Code section 12965(b), Plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount

according to proof.

## COUNT 7
### Violations of Labor Code § 1102.5, et seq

161.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

162.    Defendants' conduct, both individually and in deliberate conspiracy to cause harm and/or to violate the law as  alleged herein.

163.    At all relevant times, Labor Code section 1102.5 was in effect and was binding

on Defendants.  This statute prohibits Defendants from retaliating against any employee, including Plaintiff, for raising complaints of illegality.

164.     Plaintiff raised complaints of illegality while he worked for Defendants, and Defendants retaliated against him by discriminating against him, harassing  him,  and taking adverse employment actions, including employment termination, against him.

165.     As a proximate result of Defendants' willful, knowing, and intentional  violations of Labor Code section 1102.5, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to his damage ina sum according to proof.

166.    As a result of Defendants' adverse employment actions against Plaintiff, plain-tiff has suffered general and special damages in sums according to proof.

167.    Defendants' misconduct was committed intentionally, in a malicious, oppressive, fraudulent manner, entitling Plaintiff to punitive damages against Defendants.

## COUNT 8

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## CALIFORNIA EQUAL PAY ACT
### California Labor Code § 1197.5, *et seq*

168.     Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

169.     Defendants' conduct, both individually and in deliberate conspiracy to cause harm and/or to violate the law as  alleged herein.

170.     Plaintiff suffered harm as defined by California Labor Code § 1197.5, et seq. by paying receiving pay and benefits less than similarly situated and/or lesser qualified physicianswho performed the same or substantially similar work when viewed as a composite of skill, effort, and responsibility, and which were performed under SUTTER GOULD so discriminated by subjecting Dr. Noble to discriminatory pay, pay cuts, and discriminatory denials of bonuses, promotions and other advancement opportunities including training, promotion, on-call shifts, proper staffing and other matters set forth herein, each individually and as an aggregate, would have resulted in higher compensation.

171.     SUTTER GOULD caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on race in violation of the California Fair Pay Act. Moreover, SUTTER GOULD willfully violated the California Fair Pay Act by intentionally, knowingly, and deliberately paying Plaintiff less than similarly-situated physicians.

172.     As a result of Sutter Gould's knowing and intentional discrimination, Plaintiff has suffered and will continue to suffer harm, including but not limited to, lost earnings, lost benefits, and other financial loss, as well as noneconomic damages.

173.     Plaintiff is therefore entitled to all legal and equitable remedies,

including but notlimited to compensatory damages, and liquidated damages as provided by law.

174.    Attorneys' fees should be awarded under California Labor Code § 1197.5.

### COUNT 9
### Discrimination and Retaliation: Health and Safety Code § 1278.5

175.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

176.    Dr. Noble repeatedly stated his concerns to both the administration and medical staff of Sutter Memorial and the management of Sutter Gould, and to Drs. Fung and Talieh, regarding significant patient safety issues, including but not limited to: Sutter Memorial's use of antiquated surgical equipment, its refusal to update their OR as promised to Dr. Noble, the assignment of physicians and OR staff with inferior skills to his surgical team whose lack of skills and training endangered patient safety, and the concerted efforts by Defendants to route patients to Dr. Fung even though he was provably a surgeon with worse outcomes than Dr. Noble.

177.    Defendants ignored Dr. Noble's complaints, suggestions, and efforts to improve patients safety and the quality of care.

178.    Instead, as set forth herein, Defendants directly and indirectly discriminated and retaliated against Dr. Noble because of his complaints, grievances, and reports to Defendants.

179.    Said discrimination and retaliation occurred within 120 days of Dr. Noble's constructive discharge from Sutter Gould and his constructive forced resignation from Sutter Memorial.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

180.      Said discrimination and retaliation included Dr. Noble's constructive

discharge, his forced resignation from the Sutter Memorial Medical staff, his demotion at

Sutter Gould, the diminishment of his privileges at Sutter Memorial, and the multiple

breaches of his employment agreement with Sutter Gould and the covenant of good faith

implied therein.

181.      Wherefore, Plaintiff is entitled to $25,000 in civil penalties, reinstatement,

reimbursement of his lost wages and work benefits, and the legal costs associated with

pursuing this case.

## COUNT 10
### Intentional Infliction of Emotional Distress

182.      Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully

herein.

183.      Defendants' conduct, both individually and in deliberate conspiracy to

cause harm and/or to violate the law as  alleged herein.

184.      Defendants' discriminatory, harassing, and retaliatory actions against

Plaintiffconstituted severe and outrageous misconduct and caused  Plaintiff extreme

emotional distress.

185.      Defendants were aware that treating Plaintiff in the manner alleged

above,including depriving Plaintiff of his livelihood, would devastate Plaintiff and cause

him extreme hardship.

186.      As a proximate result of Defendants' extreme and outrageous conduct,

Plaintiffhas suffered and continues  to  suffer  severe  emotional  distress. Plaintiff has

sustainedand continues to sustain substantial losses of earnings and other employment

benefits as a result of being emotionally distressed.

187.    Defendant Lit Fung personally profited from his abusive conduct directed toward Plaintiff.

188.    As a proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to his damage in a sum according to proof.

189.    Defendants' misconduct was committed intentionally, in a malicious, oppressive, fraudulent manner, entitling Plaintiff to punitive damages.

## COUNT 11
### Negligent Infliction of Emotional Distress

190.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

191.    Defendants' conduct, both individually and in conspiracy did cause harm to Plaintiff.

192.    Defendants were in a special relationship to Plaintiff and were both partners and fiduciaries.

193.    Their conduct breached their duties to Plaintiff and caused him the harms alleged inthis complaint which include general and special damages.

194.    The conduct of Defendants and each of them were negligent and said negligence wasa substantial cause of the harms suffered by Plaintiff.

195.    The conduct of defendant was wanton, willful, malicious and done with a conscious disregard for the rights, and interests of plaintiff.  Therefore, plaintiff is entitled to punitive and exemplary damages.

## COUNT 12
### (Breach of Contract Against Sutter and Sutter Gould)

196.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

197.    Defendants' conduct, both individually and in deliberate conspiracy to cause harm and/or to violate the law as  alleged herein.

198.    Plaintiff performed each and every term, condition, and requirement of the contract.

199.    Sutter participated in Dr. Noble's recruitment and was an implied party to the contract.

200.    The conduct set forth herein breached the express terms of the contract.

201.    The breaches by Defendant were continuing and material both individually and considered as a whole.

202.    The contract contained a covenant of good faith and fair dealing implied by law.

203.    The conduct herein breached that covenant and among the other damages set forth herein caused him to incur attorney's fees as special items of damage as allowed by law.

## COUNT 13
### (Deliberate Inducement to Breach
### Contract)
### (Against Defendant Lit K. Fung only)

204.    Plaintiff realleges paragraphs 1-110 of this complaint as if set forth fully herein.

205.    Defendant Lit K. Fung acted both individually and in deliberate conspiracy

to cause harm and/or to violate the law as alleged herein. The names and identities of these additional co-conspirators are alleged herein as Does 1-100.

206.      There was a contract between Sutter Gould and Dr. Noble.

207.      Lit K. Fung acted with the deliberate intention to cause a breach of the contract between Sutter Gould and MMC and Dr. Noble. He did not merely act intentionally with malice, he acted intentionally with the purpose of causing the breaches of contract and causing harm to Plaintiff.

208.      The conduct of Lit K. Fung alone and in concert with his co-conspirators did in fact cause multiple breaches of the contract by Gould to the detriment of Dr. Noble.

209.      This wrongful conduct of Lit K. Fung and his conspirators both alone and in concert were the substantial cause of harms and damages suffered by Plaintiff.

**ELECTION OF REMEDIES**

210.      Plaintiff alleges that despite the promises made to sign the contract Gould never intended to promote him, pay him a reasonable salary, develop his skills or engage him as a fully active member of the Gould medical team. The contract was induced by fraud and Plaintiff hereby exercises his right to declare the contract null and void and pursue his damages in tort. Alternatively, a breach of contract count has been pled.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for relief as follows:

**Count 1**
**(42 U.S.C.1981)**

1. General damages according to proof;

2. Special damages according to proof;

3. Statutory remedies;

4. Punitive and exemplary damages;

5. Attorney's fees and costs according to proof;

6. Injunctive and equitable relief as the Court deems proper;

7. Such other and further relief as the Court deems proper.


**<u>Count 2</u>**
**(Violation of FEHA (Government § 12900, et seq.)**
**(Race Discrimination)**

1. General damages according to proof;

2. Special damages according to proof;

3. Statutory remedies;

4. Punitive and exemplary damages;

5. Attorney's fees and costs according to proof;

6. Injunctive and equitable relief as the Court deems proper;

7. Such other and further relief as the Court deems proper.


**<u>Count 3</u>**
**Violation of FEHA (Government § 12900, et seq.) (Race Harassment)**

1. General damages according to proof;

2. Special damages according to proof;

3. Statutory remedies;

4. Punitive and exemplary damages;

5. Attorney's fees and costs according to proof;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

6. Injunctive and equitable relief as the Court deems proper;

7. Such other and further relief as the Court deems proper.

## Count 4
### Violation of FEHA (Government Code § 12940(k)
### (Failure to Prevent Discrimination, Harassment, and Retaliation)

1. General damages according to proof;

2. Special damages according to proof;

3. Statutory remedies;

4. Punitive and exemplary damages;

5. Attorney's fees and costs according to proof;

6. Injunctive and equitable relief as the Court deems proper;

7. Such other and further relief as the Court deems proper.

## Count 5
### Wrongful Constructive Termination of Employment in Violation of Public Policy (Labor
### Code § 1102.5; FEHA, Government Code § 12900, et seq.

1. General damages according to proof;

2. Special damages according to proof;

3. Statutory remedies;

4. Punitive and exemplary damages;

5. Attorney's fees and costs according to proof;

6. Injunctive and equitable relief as the Court deems proper;

7. Such other and further relief as the Court deems proper.

## Count 7
### Violations of Labor Code § 1102.5, et seq

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1. General damages according to proof;

2. Special damages according to proof;

3. Statutory remedies;

4. Punitive and exemplary damages;

5. Attorney's fees and costs according to proof;

6. Injunctive and equitable relief as the Court deems proper;

7. Such other and further relief as the Court deems proper.

### Count 8
### CALIFORNIA EQUAL PAY ACT
### California Labor Code § 1197.5, et seq

1. General damages according to proof;

2. Special damages according to proof;

3. Statutory remedies;

4. Punitive and exemplary damages;

5. Attorney's fees and costs according to proof;

6. Injunctive and equitable relief as the Court deems proper;

7. Such other and further relief as the Court deems proper.

### Count 9
### Intentional Infliction of Emotional Distress

1. General damages according to proof;

2. Special damages according to proof;

3. Punitive and exemplary damages;

4. Such other and further relief as the Court deems proper.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

2

3

### Count 10
### Negligent Infliction of Emotional Distress

4

1. General damages according to proof;

5

2. Special damages according to proof;

6

7

3. Punitive and exemplary damages;

8

4. Such other and further relief as the Court deems proper.

9

10

### Count 11
### (Breach of Contract Against Gould Only)

11

1. General damages according to proof;

12

13

2. Special damages according to proof;

14

3. Such other and further relief as the Court deems proper.

15

16

### Count 12
### (Deliberate Inducement to Breach Contract)
### (Against Defendant Lit K. Fung only)

17

18

1. General damages according to proof;

19

2. Special damages according to proof;

20

21

3. Punitive and exemplary damages;

22

4. Such other and further relief as the Court deems proper.

23

24

Dated: 10th day of August, 2021

25

26

/s/ DANIEL HOROWITZ

27

(SBN: 92400)
LAW OFFICE OF DANIEL HOROWITZ

28

Attorney for Plaintiff

49          COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

2

3

_____

CHARLES BOND (SBN: 60611)
PHYSICIANS' ADVOCATES
Attorney for Plaintiff

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF