UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN NOBLE, M.D., | No. 2:21-cv-01433-MCE-CKD |
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| GOULD MEDICAL GROUP, INC., et al., | |
| Defendants. | |

Through the present action, Plaintiff Stephen Noble, M.D. ("Plaintiff"), seeks damages and injunctive relief, in part, from the following group of Defendants: Sutter Health, Sutter Valley Medical Foundation (sued as "Sutter Gould Medical Foundation" and "Sutter Valley Medical Foundation, Inc.") ("SGMF"), and Sutter Valley Hospitals (sued as "Sutter Memorial Medical Center") ("MMC") (collectively, "Sutter Defendants"). See First Am. Compl., ECF No. 5 ("FAC").[1]  Presently before the Court is Sutter Defendants' Motion to Dismiss Plaintiff's FAC pursuant to Federal Rule of Civil Procedure 12(b)(6),[2] which has been fully briefed.  ECF Nos. 18 ("Sutter Defs.' Mot."),

---

[1] Plaintiff also brings this lawsuit against the Gould Medical Group, Inc. ("GMG"), and Lit K. Fung, M.D ("Dr. Fung").  These parties have elected to file Answers to the FAC.  ECF Nos. 23, 24.

[2] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure.

1

26 ("Pl.'s Opp'n"), 28 ("Sutter Defs.' Reply").  For the reasons set forth below, Sutter Defendants' Motion is GRANTED.[3]

## BACKGROUND

### A. Factual Background[4]

Plaintiff is a board-certified cardiothoracic surgeon with advanced fellowship training in heart surgery and a decorated war hero for his service in the armed forces as a general and cardiothoracic surgeon.  Sutter Health is a non-profit corporation which was established to provide assistance to other corporations, including SGMF.  Plaintiff was employed by GMG and in 2018, he joined the Gould Cardiothoracic Surgery department and was granted full privileges in his specialty at both MMC and Doctors Medical Center of Modesto Hospitals, including the ability to perform operations.  Prior to his arrival, most of the heart surgeries at MMC and within GMG were performed by Dr. Fung, a senior partner and the head of the Cardiothoracic Surgery department.

According to the FAC, Dr. Fung and his fellow surgeons had a high rate of negative outcomes and poor comparative surgery results compared to national averages, and Dr. Fung also failed to keep current on newer and more precise surgery techniques such as the use of robotics.  Plaintiff was allegedly told during recruitment that his role was to introduce more modern skill sets, equipment, and techniques to improve Sutter Defendants and GMG's record of poor outcomes.  As a result, Plaintiff believed that he would be integrated into this medical group, introduce more modern cardio techniques, and improve their performance ratings in terms of patient outcomes.  However, Plaintiff alleges that Dr. Fung did not embrace him and from the outset barred Plaintiff from participating in complex surgeries, failed to train Plaintiff in areas where

---

[3] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Local Rule 230(g).

[4] The following recitation of facts is taken, sometimes verbatim, from Plaintiff's FAC.

2

Dr. Fung's knowledge was current, and blocked Plaintiff's attempts to obtain more modern surgical supplies and equipment.

According to Plaintiff, Dr. Fung's attacks were insidious and racially motivated, which belittled Plaintiff as a person and physician in the eyes of the public and staff. For example, immediately upon Plaintiff's arrival at MMC, GMG and Dr. Fung took steps to hide the fact that Plaintiff is African-American, such as failing to put Plaintiff's name and photograph on GMG's website. Dr. Fung and GMG repeatedly obstructed Plaintiff's attempts to establish and build his practice by preventing him from building a patient base and failing to introduce him to the public or other physicians through notices or personal contact. Plaintiff also alleges that Dr. Fung refused to put Plaintiff's name on the office door and that Plaintiff's office was tucked away so that it was difficult to locate him. Despite his stellar surgical achievements and years of experience, Plaintiff was allegedly treated as a novice and was excluded from participating in the major medical activities, implying that an African-American surgeon did not deserve his position. Plaintiff also alleges that Dr. Fung openly disparaged Plaintiff and prevented him from performing surgical procedures for which he was fully trained and credentialed. Given that Dr. Fung was the main source of income for the cardiothoracic surgery department at MMC, none of the other physicians or administrators opposed Dr. Fung or came to Plaintiff's defense despite Plaintiff's repeated requests and complaints.

As the early surgical data was presented, Plaintiff's outcomes were as good or better than the national averages whereas Dr. Fung and other surgeons demonstrated high failure rates. Rather than promote Plaintiff and provide better patient care, however, GMG and Dr. Fung allegedly increased their interference with Plaintiff by limiting his surgeries and giving him second rate surgical teams in order to make his success rate drop. Plaintiff also alleges that he saw other physicians, intimidated into complicity, snicker as he attempted to speak with Dr. Fung about necessary changes to improve patient care and safety. Apparently, it was a running joke that Dr. Fung would not even speak to Plaintiff unless he called or emailed Dr. Fung's wife, Judy Fung, and

1  made an appointment.  Prior to Plaintiff's arrival, Dr. Fung took 90 percent of the cardiac
2  cases at MMC and continued to do so after Plaintiff was hired even though Plaintiff was
3  more recently and better trained in heart surgery than Dr. Fung.  GMG made no effort to
4  redistribute the cases.

5        Plaintiff also alleges that, during his entire year-and-a-half tenure, GMG
6  deliberately left him off the emergency room call schedule, which was controlled by
7  Dr. Fung and his wife, even though Plaintiff had full privileges at MMC.  Despite
8  Plaintiff's repeated requests to be put on the schedule, Dr. Fung allegedly refused
9  without providing a reason.  Plaintiff discussed his exclusion from the call schedule with
10 Dr. John Talieh, MMC's Chair of Credentialing as well as Chief of Surgery and
11 Department Chair.  In those capacities, Dr. Talieh was a member of the
12 evaluation/decision-making team along with the Physician Compensation Committee
13 and a member of the Peer Review Committee.  Although he had the ability to intervene,
14 Dr. Talieh claimed that Plaintiff had "limited experience in vascular surgery," which was
15 not true, and told Plaintiff he would not be put on the schedule until Dr. Talieh "felt
16 comfortable."  Plaintiff repeatedly reached out to others in leadership positions at MMC
17 and GMG to discuss the issues he was facing but to no avail.

18       On March 21, 2019, Plaintiff was scheduled to perform a procedure, but the
19 assigned anesthesiologist refused to put the patient to sleep, allegedly citing baseless
20 and illegitimate concerns over Plaintiff's privileges to perform the procedure.  Shortly
21 thereafter, Dr. Talieh informed Plaintiff about a "letter of concern" from the anesthesia
22 department regarding Plaintiff's clinical abilities, which turned out to be a list of patient
23 names and cases that needed review.  Plaintiff claims he never saw this letter or list, but
24 it was forwarded to the Quality and Safety Department at GMG with Dr. Fung's
25 knowledge and approval.  Plaintiff soon learned that seven of his cases from Dr. Fung's
26 department were under review and as a result, Plaintiff could not resign without being
27 reported to the National Practitioners' Data Bank.
28 ///

On September 4, 2019, Plaintiff was notified that his salary would be cut by 23 percent without justification. The decision was made by members of the Physician Compensation Committee, which included Drs. Fung and Talieh. A few weeks later, on September 29, 2019, Dr. Talieh allegedly tried to coerce Plaintiff into "voluntarily" agreeing to a Performance Improvement Plan ("PIP"); however, any resignation during the pendency of a PIP is considered a "resignation while under investigation" and is reportable to the California Medical Board and the National Practitioners' Data Bank. Plaintiff refused to sign the PIP and on October 8, 2019, Plaintiff was notified that the Medical Executive Committee had initiated an investigation into Plaintiff's remaining cases. In response, Plaintiff hired an attorney and notified GMG via email that he had not agreed to a PIP.

On December 5, 2019, Plaintiff's salary was reduced again, meaning that within one year, Plaintiff's salary was cut by 60 percent, making him the lowest paid full-time cardiothoracic surgeon in the country. The peer review process ultimately ended in February 2020, with the Medical Executive Committee voting not to impose discipline on Plaintiff. The following month, in March 2020, Plaintiff resigned from GMG and the medical staff of MMC.

**B.   Procedural History**

On August 11, 2021, Plaintiff filed his original Complaint in this Court. ECF No. 1. Subsequently, on October 27, 2021, Plaintiff filed the operative FAC, which asserts the following causes of action:  (1) Violation of 42 U.S.C. § 1981 ("Count 1"); (2) Race Discrimination in Violation of California's Fair Employment and Housing Act, California Government Code §§ 12900 et seq. ("FEHA") ("Count 2"); (3) Race Harassment in Violation of FEHA ("Count 3"); (4) Failure to Prevent Discrimination, Harassment, and Retaliation in Violation of FEHA ("Count 4"); (5) Wrongful Constructive Termination of Employment in Violation of Public Policy ("Count 5"); (6) Retaliation for Engaging in Protected Activity in Violation of FEHA ("Count 6"); (7) Violations of California Labor Code §§ 1102.5 et seq. ("Count 7"); (8) California Equal Pay Act, California Labor Code

§§ 1197.5 et seq. ("Count 8"); (9) Discrimination and Retaliation in Violation of California Health and Safety Code § 1278.5 ("Count 9"); (10) Intentional Infliction of Emotional Distress ("IIED" or "Count 10"); (11) Negligent Infliction of Emotional Distress ("NIED" or "Count 11"); (12) Breach of Contract against Defendants "Sutter" and "Sutter Gould" ("Count 12"); and (13) Deliberate Inducement to Breach of Contract against Dr. Fung ("Count 13").

## STANDARD

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the nonmoving party. Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996). Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require detailed factual allegations. However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (internal citations and quotations omitted). A court is not required to accept as true a "legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) (stating that the pleading must contain something more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action")).

///

6

1    Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket
2 assertion, of entitlement to relief." Twombly, 550 U.S. at 555 n.3 (internal citations and
3 quotations omitted).  Thus, "[w]ithout some factual allegation in the complaint, it is hard
4 to see how a claimant could satisfy the requirement of providing not only 'fair notice' of
5 the nature of the claim, but also 'grounds' on which the claim rests." Id. (citing Wright &
6 Miller, supra, at 94, 95).  A pleading must contain "only enough facts to state a claim to
7 relief that is plausible on its face." Id. at 570.  If the "plaintiffs . . . have not nudged their
8 claims across the line from conceivable to plausible, their complaint must be dismissed."
9 Id.  However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that
10 actual proof of those facts is improbable, and 'that a recovery is very remote and
11 unlikely.'" Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).
12   A court granting a motion to dismiss a complaint must then decide whether to
13 grant leave to amend.  Leave to amend should be "freely given" where there is no
14 "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice
15 to the opposing party by virtue of allowance of the amendment, [or] futility of [the]
16 amendment . . . ." Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v.
17 Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to
18 be considered when deciding whether to grant leave to amend).  Not all of these factors
19 merit equal weight.  Rather, "the consideration of prejudice to the opposing party . . .
20 carries the greatest weight." Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183,
21 185 (9th Cir. 1987)).  Dismissal without leave to amend is proper only if it is clear that
22 "the complaint could not be saved by any amendment." Intri-Plex Techs., Inc. v. Crest
23 Group, Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d
24 1006, 1013 (9th Cir. 2005); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160
25 (9th Cir. 1989) ("Leave need not be granted where the amendment of the complaint . . .
26 constitutes an exercise in futility . . . .")).
27 ///
28 ///

7

# ANALYSIS[5]

Sutter Defendants assert that Plaintiff's claims premised on violations of FEHA (Counts 2, 3,[6] 4, 6) and wrongful constructive termination (Count 5) all require the existence of an employee-employer relationship in order to be actionable against them. See Cal. Gov't Code § 12940(a), (h), (j), (k), (m), (n); Yau v. Santa Margarita Ford, Inc., 229 Cal. App. 4th 144, 154 (2014) (stating one of the elements for a claim of wrongful discharge in violation of public policy is an employer-employee relationship). Similarly, they contend that Plaintiff's claims for violation of California Health and Safety Code § 1278.5 (Count 9), IIED (Count 10), and NIED (Count 11) also depend on Sutter Defendants' status as Plaintiff's employer. Consequently, according to Sutter Defendants, the claims asserted by Plaintiff against them fail in the absence of an employment relationship.

In the FAC, Plaintiff alleges that he was employed by GMG. See FAC ¶ 20. Nevertheless, Plaintiff seeks to hold Sutter Defendants liable as a single enterprise with GMG, arguing that they are corporate affiliates given that all entities in the Sutter Health system use the word "Sutter" and report to a single chief executive officer. Id. ¶ 17. "There is a presumption that separate corporate entities have distinct identities, and plaintiffs bear a heavy burden under both California and federal law when they seek to rebut this presumption and hold multiple corporate entities liable as a single employer." Rhodes v. Sutter Health, No. CIV. 2:12-0013 WBS DAD, 2012 WL 1868697, at *6 (E.D. Cal. May 22, 2012) (citing Laird v. Capital Cities/ABC, Inc., 68 Cal. App. 4th 727, 737 (1998)). Attaching the name "Sutter" to all corporate Defendants and claiming that

---

[5] Plaintiff specifies that Counts 8 and 13 do not apply to Sutter Defendants and concedes that Count 7 should be dismissed as to Sutter Defendants only. See Pl.'s Opp'n at 5. Accordingly, those causes of action are hereby DISMISSED without leave to amend as to Sutter Defendants.

[6] The parties agree that harassment claims under FEHA may be brought against individual employees. See Pl.'s Opp'n at 17; Sutter Defs.' Reply at 5 n.1. However, Sutter Defendants contend that there is "no authority suggesting that FEHA harassment claims can be brought against a non-employer entity." Id.

Sutter Defendants frequently change their corporate names and structures to confuse others are insufficient on their own to overcome this burden, as Plaintiff concedes. FAC ¶ 17; see Pl.'s Opp'n at 7 (recognizing that "[n]one of these allegations are sufficient by themselves, but they do put into play the question as to whether" Sutter Defendants are liable).

Plaintiff attempts to overcome this presumption through an integrated enterprise theory in which four factors are considered: (1) the interrelation of operations between the two entities; (2) whether they share common management; (3) the degree to which centralized control of labor relations exists; and (4) whether there is common ownership or financial control. Laird, 68 Cal. App. 4th at 737–38 (citations omitted); see Pl.'s Opp'n at 6–16. "Although courts consider the four factors together, they often deem centralized control of labor relations the most important." Laird, 68 Cal. App. 4th at 738. To satisfy the "control" prong, the first entity must control the day-to-day operations of the second. Id. Ultimately, "[t]he critical question is, what entity made the final decisions regarding employment matters related to the person claiming discrimination?"[7] Id. (internal quotation marks and alterations omitted).

Plaintiff seeks to show an integrated enterprise, in part, by alleging that (1) "Sutter participated in [Plaintiff's] recruitment," and that (2) Dr. Fung's wife, Judy Fung, "scheduled cardiothoracic surgeries for Sutter Gould patients" despite not being an employee of GMG or Sutter Defendants, and that all Defendants were aware of her doing so. FAC ¶¶ 27, 199. However, neither of these allegations demonstrate that Sutter Defendants exercised ongoing control over the day-to-day operations of GMG or that Sutter Defendants maintained control over Plaintiff's employment.

Plaintiff further alleges that he discussed his exclusion from the call schedule with Dr. Talieh, MMC's "Chair of Credentialing as well as Chief of Surgery," who also served

---

[7] There is a question as to whether the integrated enterprise test applies in cases not involving a parent-subsidiary corporate relationship such as here. See Rhodes v. Sutter Health, 949 F. Supp. 2d 997, 1006–07 (2013). None of the parties raise this contention but regardless, for the reasons set forth below, the Court finds that the FAC as pleaded does not contain any allegations suggesting the existence of a single integrated enterprise.

as "a member of the evaluation/decision-making team along with the Physician Compensation Committee, and a member of the Peer Review Committee." FAC ¶ 63. First, this allegation does not implicate either Sutter Health or SGMF. As for MMC, Sutter Defendants argue that even if Plaintiff alleged Dr. Talieh was employed by MMC, Sutter Defs.' Reply at 7, California law prohibits the corporate practice of medicine which means that "[h]ospitals are required by law to have a medical staff association which oversees physicians who are given staff privileges to admit patients and practice medicine in the hospital." Bichai v. Dignity Health, 61 Cal. App. 5th 869, 878–79 (2021) (quoting Hongsathavij v. Queen of Angels/Hollywood Presbyterian Med. Ctr., 62 Cal. App. 4th 1123, 1130 n.2 (1998)). "A hospital's medical staff is a separate legal entity, an unincorporated association, which is required to be self-governing and independently responsible from the hospital for its own duties and for policing its member physicians." Id. Accordingly, because MMC cannot employ Dr. Talieh, this argument also fails. See Sutter Defs.' Reply at 7.

Aside from the aforementioned allegations, Plaintiff has not alleged that Sutter Defendants "hired him, set his compensation, or maintained any of his personnel records." Sutter Defs.' Reply at 8; see Pl.'s Opp'n at 17 (clarifying that the California Equal Pay Act claim does not apply to Sutter Defendants). Nor does Plaintiff allege that Sutter Defendants imposed any discipline on Plaintiff. "The key question in the integrated enterprise inquiry is who is responsible for the employment decisions at issue, and [Plaintiff] has alleged no facts to suggest that Sutter [Defendants] played any role in the decisions" alleged in the FAC. Rhodes, 2012 WL 1868697, at *7. As such, the Court finds that the FAC fails to allege the existence of an integrated enterprise.

In regard to all causes of action asserted against Sutter Defendants, Plaintiff has failed to allege any specific actions taken by Sutter Defendants in accordance with applicable pleading standards. Indeed, Plaintiff's entire theory of liability as to Sutter Defendants is based on their alleged corporate affiliation with GMG. As set forth in the Background section, all of the alleged adverse actions, including the peer review

process and Plaintiff's exclusion from the call schedule, were done by GMG and/or Dr. Fung.  As pleaded, the FAC does not specify any actions taken by any of the Sutter Defendants and therefore, dismissal is warranted on this ground as well.  Accordingly, Sutter Defendants' Motion to Dismiss is GRANTED, and Counts 1, 2, 3, 4, 5, 6, 9, 11, and 12 as to Sutter Defendants are hereby DISMISSED with leave to amend.

## CONCLUSION

For the foregoing reasons, Sutter Defendants' Motion to Dismiss, ECF No. 18, is GRANTED.  Counts 7, 8, and 13 are DISMISSED without leave to amend whereas all remaining counts are DISMISSED with leave to amend as to Sutter Defendants only.  Not later than twenty (20) days following the date this Memorandum and Order is electronically filed, Plaintiff may (but is not required to) file a second amended complaint.  If no second amended complaint is timely filed, the causes of actions dismissed by virtue of this Memorandum and Order will be dismissed with prejudice without further notice to the parties.

IT IS SO ORDERED.

Dated:  August 29, 2022

MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE